T.C. Memo. 2011-114

UNITED STATES TAX COURT

THOMAS F. AND KATHRYN H. CHAMBERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 533-09.                    Filed May 31, 2011.

<u>Scott W. Gross</u>, for petitioners.

<u>Ronald S. Collins, Jr.</u>, <u>John A. Guarnieri</u>, and <u>Arslan Malik</u>,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  Respondent determined income tax deficiencies
of $37,594 and $18,769, and fraud penalties pursuant to section
6663[1] of $28,195.50 and $14,076.75, for petitioners' 2005 and

_____

[1]Unless otherwise indicated, section references are to the
                                        (continued...)

2006 tax years, respectively. The issues we must decide are: (1) Whether respondent bears the burden of proof on the additional deficiency respondent has asserted for 2006;[2] (2) whether petitioners must include in their gross income for their 2005 and 2006 tax years the amounts respondent determined on the basis of the analysis of petitioners' bank deposits; and (3) whether petitioners are liable for the fraud penalties pursuant to section 6663.

### FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The parties' stipulations of fact are incorporated in this opinion by reference and are found accordingly. At the time they filed their petition, petitioners resided in Pennsylvania. Petitioners are husband and wife (hereinafter referred to individually as Mr. Chambers and Mrs. Chambers, respectively) who filed joint tax returns for their 2005 and 2006 tax years (the years in issue).

---

[1](...continued)
Internal Revenue Code of 1986 (Code), as amended and in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The notice of deficiency issued to petitioners stated that respondent had determined a deficiency for 2006 of $12,027, but in his answer respondent asserts that that number was incorrect because of a computation error and that the correct amount of petitioners' deficiency is $18,769.

Mr. Chambers is an ordained minister who, during the years in issue, was the sole pastor of Biblical Church Ministries (sometimes also referred to as Biblical Church or Biblical Church and Global Ministries). Before he founded Biblical Church during 2003, Mr. Chambers had been the senior pastor of Pilgrim Bible Church since 1991. He resigned from his position at Pilgrim Bible Church because he wanted to concentrate more on global evangelism and planned to be out of the country for many weeks during the year. However, about a dozen of his former congregants at Pilgrim Bible Church asked him to continue leading them in studying the Bible on Sunday mornings. Mr. Chambers agreed to continue leading them in Sunday worship with the understanding that he would be ministering abroad a number of weeks during the year and that someone else would lead worship when he was absent.

During 2003 Mr. Chambers organized Biblical Church as a "corporation sole" under Utah law. He designated himself as "overseer" of Biblical Church. As overseer, he had full control over the corporation sole, including the authority to amend its articles of corporation sole and appoint his successor. During 2006 petitioners transferred the ownership of their home from themselves as individuals to Mr. Chambers as overseer of Biblical Church, a corporation sole.

Since its inception Biblical Church has held worship services every Sunday and Bible studies on Wednesday nights. The Sunday services are held at the home of one of the church members, and the Wednesday night studies meet at petitioners' home.  A typical service includes worship music, prayer, and teaching from the Bible.  The normal attendance at the Sunday services ranges from 15 to 25 people.  Many of those individuals attend Biblical Church exclusively as their regular church.  In addition to leading worship on Sundays and Bible studies on Wednesdays, Mr. Chambers provides pastoral counseling to the members of Biblical Church.

Mr. Chambers followed through on his plans to participate in many overseas evangelism trips.  In addition to his job as a pastor at Biblical Church, he is on the staff of e3 Partners,[3] an organization that is exempt from tax pursuant to section 501(c)(3).  Mr. Chambers' role with e3 Partners is "church planter", and his primary responsibility is to lead short-term mission trips to other countries, where he trains local pastors and other volunteers in evangelism.

During each of the years in issue Mr. Chambers led two trips with e3 Partners and participated in a third trip.  His travels included:  A trip to Peru during April 2005; trips to two

---

[3]The organization was also known as Global Partners during some of the years in issue.  However, to avoid confusion, we will refer to it only as e3 Partners.

different locations in Venezuela from late June to mid-July 2005; a trip to India that lasted from December 31, 2005, until early February 2006; a trip to Costa Rica during March 2006; and a trip to South Africa during July 2006.  His family accompanied him on the mission trips, and at least five members of his congregation also participated in at least one trip.  Other congregations sent volunteers on the trips he led, and he was responsible for training the members of his team in the United States before they traveled abroad.

The team members were responsible for raising their own funds for each trip, but e3 Partners coordinated fundraising by receiving donations on behalf of individual team members and using those donations to pay trip expenses for those team members.  Portions of the funds raised by all of the team members were directed to the team leaders, like Mr. Chambers, who were responsible for handling all of the day-to-day expenses the team would encounter on the trip.  Before each trip, e3 Partners deposited funds into a bank account provided by the team leader, who then withdrew the cash needed for the trip.  All expenses incurred during the trip had to be documented by receipts, and the team leader was responsible for returning any unused funds to e3 Partners at the end of the trip.  During the years in issue Mr. Chambers received into his personal bank account numerous deposits to cover trip expenses from e3 Partners, and the parties

agree that such funds were properly excluded from petitioners' income.

In addition to the funds deposited into petitioners' personal checking account by e3 Partners on behalf of other team members, petitioners also conducted their own, separate fundraising for their missions trips. Mr. Chambers solicited donations by personally contacting people through letters or phone calls. Some of the individuals he contacted made donations by writing checks to e3 Partners, but others gave by writing checks to Biblical Church, which Mr. Chambers would deposit in one of Biblical Church's bank accounts.

During both 2005 and 2006 petitioners maintained a personal checking account at M&T Bank (M&T account). Petitioners also maintained checking accounts for Biblical Church at National Penn Bank (National Penn account) and the Bank of Lancaster County (Lancaster account) (collectively, the Biblical Church bank accounts or the church bank accounts). Petitioners were the only authorized signatories for the Biblical Church bank accounts. The name listed on the church bank accounts was "Biblical Church and Global Ministries", but petitioners usually deposited checks made payable to "Biblical Church" into the National Penn account and checks made payable to "Global Ministries" into the Lancaster account. Biblical Church had two bank accounts because Mr. Chambers was trying to separate funds for the church itself from

funds that were intended to support its overseas mission trips. He had originally planned to save some of the church funds to purchase a building; but because he was very passionate about the mission work, he put most of the money toward missions.

Petitioners opened the Lancaster account before they had obtained an employment identification number (EIN) from the Internal Revenue Service (IRS). They told the bank representative that they had applied for an EIN but had not yet received it. The bank representative nonetheless allowed them to open a bank account, and she typed all of the information required on the new deposit account coversheet but left blank the space for the EIN. She then printed out the new deposit account coversheet, had petitioners sign it, and instructed them to inform the bank as soon as they received the EIN from the IRS. The bank representative's actions in setting up the account, printing out the new account coversheet, and leaving blank the space for the EIN were consistent with protocol established by the Bank of Lancaster County at that time.

At some point, a nine-digit number was handwritten in the space for the tax identification number on the new account coversheet. The nine-digit number written on the new account coversheet and subsequently associated with the Lancaster account is the Social Security number of a minor child unrelated to petitioners, not the EIN assigned to Biblical Church. The minor

child who was assigned the Social Security number was not an account holder at the Bank of Lancaster County when petitioners created the Lancaster account.

Several months after they opened the Lancaster account, petitioners also opened the National Penn account. Petitioners supplied National Penn Bank with Biblical Church's EIN, which they had obtained from the IRS by the time they opened the National Penn account. When petitioners discovered that the EIN associated with the Lancaster account was incorrect, at some point during 2006, they closed that account and opened a new account at Northwest Savings Bank (Northwest account), using a new EIN. Biblical Church also maintained an investment account at LPL Financial during the years in issue.[4]

During the years in issue petitioners performed part-time janitorial work for Superior Walls of America, Ltd. (Superior Walls). Petitioners were paid $13 per hour for performing cleaning services about 15 hours each week. Mr. Chambers intended the compensation from Superior Walls as a fundraiser for his mission trips and for Biblical Church. He spoke with the financial controller at Superior Walls and explained his desire to perform janitorial services as a fundraiser for Biblical Church. Pursuant to an agreement with Superior Walls, instead of

---

[4]Respondent has not contended that deposits into the Northwest account or into the investment account at LPL Financial should be included in petitioners' income.

paying petitioners themselves for the work, Superior Walls paid Biblical Church directly. Mr. Chambers executed a Form W-9, Request for Taxpayer Identification Number and Certification, on behalf of Biblical Church, which he submitted to Superior Walls, claiming to be exempt from Federal tax withholding.

Petitioners later learned that the law required them to report the compensation from Superior Walls as taxable income, and they began to report the compensation as income during 2006.[5] Petitioners reported their income from Superior Walls during 2006 on a Schedule C attached to their Form 1040, U.S. Individual Income Tax Return.

During the years in issue, the deposits into the Biblical Church bank accounts primarily consisted of numerous small checks written by individuals. Members and regular attendees of Biblical Church wrote checks that accounted for the largest number of deposits. Many of those individuals contributed a regular tithe or offering. Other checks were written by individuals who made only a few donations during the years in issue. Some checks were written by other churches. In total, about 50 individuals and three churches wrote at least one check to Biblical Church during the years in issue.

---

[5]Petitioners concede that compensation of $12,122 that they received from Superior Walls during 2005 should have been reported on their return for that year.

During the years in issue, petitioners wrote checks or otherwise used the funds in the church bank accounts as follows:

### Lancaster Account

| Date | Check No. | Payee | Amount |
| --- | --- | --- | --- |
| 1/14/05 | 136 | LPL Financial Account 9842 | $9,000.00 |
| 3/18/05 | 137 | Unknown | 170.00 |
| 4/13/05 | 139 | LPL Financial Account 9842 | 9,000.00 |
| 4/14/05 | Debit card | Apple Computer | 1,199.92 |
| 4/22/05 | 140 | Unknown | 1,039.00 |
| 4/22/05 | 141 | LPL Financial Account 9842 | 7,000.00 |
| 5/4/05 | 142 | CMTS | 3,000.00 |
| 5/26/05 | 143 | Association for Biblical Research | 2,075.00 |
| 6/14/05 | 144 | Unknown | 159.00 |
| 7/1/05 | 145 | Unknown | 9,000.00 |
| 8/4/05 | 8165 | Kathryn Chambers | 1,675.00 |
| 8/15/05 | 146 | Unknown | 9,500.00 |
| 10/31/05 | 148 | Unknown | 8,575.00 |
| 11/21/05 | 147 | Unknown | 300.00 |
| 2/7/06 | 19183 | Thomas Chambers | 1,500.00 |
| 2/14/06 | 149 | Best Buy | 849.99 |
| 2/28/06 | 150 | Cash | 4,500.00 |
| 3/6/06 | 151 | Cash | 8,500.00 |
| 3/21/06 | 152 | Cash | 8,000.00 |
| 3/30/06 | 153 | Cash | 7,675.00 |
| 4/11/06 | 154 | Cash | 4,100.00 |
| 4/21/06 | Debit card | WAWA | 60.25 |
| 6/7/06 | Debit card | CHR*CHRISTIAN BK | 430.08 |
| 6/15/06 | Debit card | DELL CATALOG SALES | 1,590.46 |
| 7/3/06 | 157 | Trinity Evangelical Divinity School | 1,000.00 |
| 8/7/06 | 158 | Unknown | 2,210.00 |
| 8/22/06 | 159 | Unknown | 100.00 |
| 9/7/06 | 160 | Secretary of State | 25.00 |
| 9/15/06 | 161 | Byers Garage | 601.36 |
| 9/18/06 | 162 | Webster, Chamberlain & Bean | 258.42 |

### National Penn Account

| Date | Check No. | Payee | Amount |
| --- | --- | --- | --- |
| 4/8/05 | None | Thomas F. Chambers | $2,500 |
| 5/26/05 | None | Tom Chambers | 2,000 |
| 6/24/05 | None | Thomas Chambers | 2,700 |

| 10/31/05 | None | Thomas Chambers | 6,500 |
| 11/23/05 | None | Thomas Chambers | 3,000 |
| 12/9/05 | None | Tom Chambers | 3,500 |
| 12/30/05 | None | Thomas Chambers | 1,875 |
| 2/28/06 | None | Thomas Chambers | 4,500 |
| 3/6/06 | None | CASA | 1,100 |
| 3/29/06 | None | Thomas Chambers | 900 |
| 4/18/06 | None | Thomas Chambers | 3,500 |
| 5/1/06 | None | Kathryn Anne Chambers | 800 |
| 6/1/06 | None | Thomas F. Chambers | 1,000 |
| 6/9/06 | None | Tom Chambers | 1,700 |

The IRS reconstructed petitioners' income for the years in issue by examining the deposits to the M&T account, the Lancaster account, and the National Penn account. The IRS did not include deposits into the Northwest account when it reconstructed petitioners' income. However, the parties have included bank statements and canceled checks from the Northwest account among the stipulated exhibits before the Court. Those records show that petitioners used the debit card from the Northwest account to pay for numerous purchases at Wal-Mart, K-Mart, Staples, Dollar General, and a variety of other retailers, as well as many purchases at gas stations and restaurants. Petitioners wrote checks on the Northwest account to pay for many household expenses, including their gas bills, cable bills, and sewer bills. They also wrote checks to a tile company, a chimney sweep, a mattress store, a dentist, a newspaper, a mechanic, and a cement company.

On October 2, 2008, respondent mailed to petitioners a notice of deficiency determining deficiencies in income tax of

$37,594 and $12,027 and penalties pursuant to section 6663 of

$28,195.50 and $9,020.25 for their 2005 and 2006 tax years,

respectively.  Petitioners timely filed their petition with this

Court.  As noted above, in his answer respondent asserts that

there was a computation error in the notice of deficiency and

that the correct deficiency and penalty under section 6663 for

2006 are $18,769 and $14,076.75, respectively.

OPINION

I.   Whether Respondent Bears the Burden of Proof on the
     Additional Deficiency

Generally, the Commissioner's determination of a deficiency

is presumed correct, and the taxpayer has the burden of proving

it incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115

(1933).  However, the Commissioner generally bears the burden of

proof with respect to any increases in deficiency.  Rule 142(a).

The parties agree that petitioners bear the burden of proof

on the amounts determined on the first page of the notice of

deficiency.  However, petitioners contend that respondent has the

burden of proof on the additional amount of deficiency for 2006

asserted in the answer.  Respondent contends that the additional

deficiency should not be considered an increase in deficiency

because the increase was due to a computation error.  We agree

with respondent.

There is no "increase in deficiency" where the increase

results from a computation error.  Estate of Bowers v.

<u>Commissioner</u>, 94 T.C. 582, 595 (1990). In the instant case, the
"increase in deficiency" resulted from the IRS' omission of the
2006 deposits into the Lancaster account when the IRS calculated
the total deposits during 2006. The IRS attached a Form 886A,
Explanation of Items, to the notice of deficiency. In a table in
that Form 886A labeled "Tax Year 2006", the IRS included the 2006
deposits into the Lancaster account. However, in a column of
that table, the IRS erroneously labeled those 2006 deposits 2005
deposits. The IRS used another table to calculate the total
deposits for 2005. However, the IRS did not include the 2006
deposits into the Lancaster account when it actually summed the
deposits for either 2005 or 2006. It is clear from the Form 886A
that the IRS intended to include the 2006 deposits into the
Lancaster account as part of petitioners' income for that year.
Indeed, it is obvious that the 2006 table in the Form 886A
contains a computation error because the separate amounts in the
table sum to more than the purported total for that year. This
computation error is similar to that in <u>Estate of Bowers</u>, where
we held that because the increase in deficiency resulted solely
from a computation error, it was unrelated to the burden of
proof, and the correct deficiency would be determined by
computation. In accordance with <u>Estate of Bowers</u>, we hold that
petitioners bear the burden of proof on the additional deficiency
asserted in the answer.

II.  Petitioners' Tax Liability

   A.   Whether Petitioners Must Include Biblical Church
        Deposits in Their Income

Respondent contends that Biblical Church is not a church.

Respondent also contends that even if Biblical Church is a

church, money deposited into the church bank accounts was still

income to petitioners because they exercised complete control

over the bank accounts and used money from those accounts to pay

personal expenses.

The term "church" is not defined in the Code or the

regulations.  We have held that whether an entity is a church is

a fact-specific inquiry that considers primarily the entity's

religious purposes and the means by which those purposes are

accomplished.  Found. of Human Understanding v. Commissioner, 88

T.C. 1341, 1357 (1987).  The IRS uses the following 14 criteria

(the criteria) to determine whether an entity is a church:

   "(1) a distinct legal existence;

   (2) a recognized creed and form of worship;

   (3) a definite and distinct ecclesiastical government;

   (4) a formal code of doctrine and discipline;

   (5) a distinct religious history;

   (6) a membership not associated with any other church
   or denomination;

   (7) an organization of ordained ministers;

   (8) ordained ministers selected after completing
   prescribed studies;

(9) a literature of its own;

(10) established places of worship;

(11) regular congregations;

(12) regular religious services;

(13) Sunday schools for religious instruction of the young; and

(14) schools for the preparation of its ministers.
* * *"

Id. at 1358 (quoting Internal Revenue Manual 7(10)69, Exempt Organizations Examination Guidelines Handbook 321.3(3) (Apr. 5, 1982)).  Although we have declined to adopt the criteria, we have stated that they are helpful in deciding the factual question of whether an entity is a church.  Id.  We recognize that few traditional churches could satisfy all of the criteria.  See id. As a minimum threshold, we have held that "'a church includes a body of believers or communicants that assembles regularly in order to worship.'"  Id. at 1357 (quoting Am. Guidance Found., Inc. v. United States, 490 F. Supp. 304, 306 (D. D.C. 1980)).

Biblical Church satisfies many of the criteria.  Mr. Chambers is an ordained minister, the church has a distinct legal existence as a corporation sole, the church has been meeting regularly on Sundays since 2003, its worship services include a core group of 15 to 25 attendees who exclusively attend Biblical Church, its worship services are consistently held at the same place, and Mr. Chambers teaches recognized Christian doctrine.

On the basis of the foregoing, we conclude that Biblical Church is a church.

We next consider respondent's contention that, even if Biblical Church is a church, money deposited into its accounts was still income to petitioners because they exercised full control over it and used it to pay personal expenses.

When a taxpayer fails to keep adequate books and records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. See sec. 446(b); Petzoldt v. Commissioner, 92 T.C. 661, 693 (1989). The Commissioner may use indirect methods, and he is given latitude in determining which method of reconstruction to apply. Petzoldt v. Commissioner, supra at 693. The Commissioner's reconstruction of a taxpayer's income need only be reasonable in the light of all surrounding facts and circumstances. Schroeder v. Commissioner, 40 T.C. 30, 33 (1963); see also Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970).

One of the indirect methods of reconstructing income is the bank deposit method. "The use of the bank deposit method for computing income has long been sanctioned by the courts." Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Bank deposits constitute prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see also Clayton v. Commissioner, 102 T.C. 632, 645 (1994). When a

taxpayer keeps inadequate or incomplete books or records and has large bank deposits, the Commissioner is not acting arbitrarily or capriciously by resorting to the bank deposit method. See DiLeo v. Commissioner, 96 T.C. 858, 867-868 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

The bank deposit method of reconstruction assumes that all of the deposits into a taxpayer's account are taxable income unless the taxpayer can show that the deposits are not taxable. Id. at 868. The Commissioner need not show a likely source of the income when using the bank deposit method, but the Commissioner must take into account any nontaxable items or deductible expenses of which the Commissioner has knowledge. See Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964); see also DiLeo v. Commissioner, supra at 868. The burden of proof is on the taxpayer to show that the deposits are not taxable income. Rule 142(a); Dodge v. Commissioner, 96 T.C. 172, 181 (1991), affd. in part, revd. in part and remanded on other grounds 981 F.2d 350 (8th Cir. 1992); Reaves v. Commissioner, 31 T.C. 690, 718 (1958), affd. 295 F.2d 336 (5th Cir. 1961).

Generally, where a taxpayer has dominion and control over diverted funds, they are includable in the taxpayer's gross income under section 61(a). United States v. Goldberg, 330 F.2d 30, 38 (3d Cir. 1964); Davis v. United States, 226 F.2d 331, 334-335 (6th Cir. 1955). We generally have held that when the

Commissioner uses the bank deposit method to reconstruct a taxpayer's income, the taxpayer's gross income includes deposits into all accounts over which the taxpayer has dominion and control, not just deposits into the taxpayer's personal bank accounts.  See Price v. Commissioner, T.C. Memo. 2004-103; Cohen v. Commissioner, T.C. Memo. 2003-42; Woodall v. Commissioner, T.C. Memo. 2002-318; Woods v. Commissioner, T.C. Memo. 1989-611, affd. without published opinion 929 F.2d 702 (6th Cir. 1991).  A taxpayer has dominion and control over an account when the taxpayer has the freedom to use its funds at will.  See Rutkin v. United States, 343 U.S. 130, 137 (1952).

We have held that deposits made to a lawyer's "cash management" accounts were income to the taxpayer where she was the only signatory on the account, used it to pay personal expenses, and did not disclose its existence to her law firm's accountant.  See Price v. Commissioner, supra.  Additionally, we have held that deposits made into the account of a taxpayer's S corporation, of which he was the sole shareholder, were includable in his gross income.  See Cohen v. Commissioner, supra.  Furthermore, we have held that deposits into the accounts of a purported trust for an investment project were income to a taxpayer where he had the power to make withdrawals, his Social Security number was the only one on the accounts, he was one of two signatories, his business address was on the accounts, and he

made transfers into and out of the accounts.  See <u>Woodall v. Commissioner</u>, <u>supra</u>.  Finally, we have held that deposits made into the account of a purported church were includable in the taxpayers' gross income where the taxpayers were the owners of the bank accounts, exercised complete control over the funds in the accounts, and used those funds for personal expenditures.  See <u>Woods v. Commissioner</u>, <u>supra</u>.

In <u>Woods</u>, we held that it was unnecessary to disregard the separate existence of the purported church in order to reach our conclusion that funds deposited in the church's accounts were income to the taxpayers.  We stated:

> It is not necessary to disregard the separate existence of the church or to challenge the tax status of the church as an entity in order to sustain respondent's determinations in this case.  Whether they were entitled to the funds or embezzled the funds from the church, petitioners exercised complete dominion and control over deposits into the various bank accounts that were the basis of respondent's determination.  * * *

<u>Id.</u>  Respondent contends that we should apply the same reasoning to hold that all of the funds deposited into Biblical Church's bank accounts during the years in issue are includable in petitioners' gross income.

It is undisputed that petitioners were the only signatories on the Biblical Church bank accounts and that the address listed on those accounts was that of petitioners.  Mr. Chambers testified that he used the money in the church bank accounts for mission trips, mission expenses, other ministry expenses, and

church expenses. Petitioners contend that the large number of
checks written to themselves or to cash, totaling more than
$70,000, were all for use on their mission trips, and they
contend that the dates of those withdrawals line up with the
dates of their mission trips. Yet many of the withdrawal dates
bear little relationship to the dates of their mission trips.
For instance, Mr. Chambers wrote checks to himself for $6,500 on
October 31, 2005, $3,000 on November 23, 2005, and $3,500 on
December 9, 2005, yet petitioners did not leave on their trip to
India until December 31, 2005. Petitioners have supplied no
receipts, records, or other evidence to substantiate their
testimony regarding the use of the cash they withdrew from the
Biblical Church bank accounts.

Petitioners contend that their failure to supply records
from Biblical Church to substantiate their testimony regarding
the use of church funds should be excused because pursuant to
section 7611 the IRS cannot compel them to produce church
records. Section 7611 sets forth certain procedures with which
the IRS must comply before it can obtain records of a church in
connection with an examination of that church's tax liability.
However, section 7611(i)(2) provides that those procedural
requirements do not apply to "any inquiry or examination relating
to the tax liability of any person other than a church". Courts
generally have held that where the IRS is examining the tax

liability of an individual, such as a pastor, rather than the church itself, section 7611 does not apply. See St. German of Alaska E. Orthodox Catholic Church v. United States, 840 F.2d 1087, 1092 n.3 (2d Cir. 1988); Kerr v. United States, 801 F.2d 1162, 1164 (9th Cir. 1986). We agree. Accordingly, petitioners' failure to produce church records that would substantiate their testimony about how they used the cash withdrawn from the Biblical Church bank accounts is not excused by section 7611.

The record suggests that petitioners sometimes used Biblical Church funds to pay personal expenses. Although respondent has not contended that deposits into the Northwest account are includable in petitioners' income, the parties nonetheless have included bank statements and canceled checks from that account in the evidence before the Court. Respondent contends that the statements and canceled checks from the Northwest account show that petitioners used Biblical Church funds to pay personal expenses. Indeed, those records show that petitioners used the debit card from the Northwest account to pay for numerous purchases at retail stores, gas stations, and restaurants. Petitioners wrote checks on the Northwest account to pay for many household expenses. Very few of the purchases from the Northwest account bear any obvious relation to Biblical Church, and petitioners did not offer any testimony or other evidence to explain how those purchases were used by the church.

Petitioners contend that even if some of the expenses paid from the Northwest account were personal, those amounts are not includable in petitioners' income because they were for the purpose of providing a home for Mr. Chambers, a minister of the gospel, and therefore are exempt from taxation under section 107. However, in order for a minister's housing allowance to be exempt from taxation under section 107, it must be designated as a housing allowance by an official action of the church in accordance with section 1.107-1(b), Income Tax Regs., which provides:

> The term "rental allowance" means an amount paid to a minister to rent or otherwise provide a home * * * if such amount is designated as rental allowance pursuant to official action taken in advance of such payment by the employing church or other qualified organization * * *. The designation of an amount as rental allowance may be evidenced in an employment contract, in minutes of or in a resolution by a church or other qualified organization or in its budget, or in any other appropriate instrument evidencing such official action. The designation referred to in this paragraph is a sufficient designation if it permits a payment or a part thereof to be identified as a payment of rental allowance as distinguished from salary or other remuneration.

On the basis of the record, it appears that Mr. Chambers received no official salary from Biblical Church, and nothing in the record suggests that Biblical Church took any official action to designate a housing allowance for Mr. Chambers. Accordingly, petitioners' argument that their personal housing expenses are exempt from taxation fails. See Eden v. Commissioner, 41 T.C. 605, 608 (1964).

Petitioners testified that they used the cash they withdrew from the Biblical Church accounts for their overseas mission trips, and we believe they may have used some of the cash for those trips. However, the evidence also shows that petitioners sometimes used funds from the church bank accounts to pay their personal expenses, suggesting the likelihood that they also used some of the cash they withdrew from the church bank accounts for trips to pay their personal expenses. Petitioners produced no receipts or other documentation to show how the cash was used or how much money they spent on overseas mission trips. Because the burden of proof is on petitioners to produce such records and because petitioners have failed to produce any documentation, we conclude that petitioners have failed to meet their burden.

Petitioners had unfettered access to the funds in the church accounts, and there is no evidence that the Biblical Church congregation had any say over how those funds were used. Indeed, the only member of the Biblical Church congregation who testified at trial had no knowledge of the church's finances, suggesting that petitioners did not share any information about church finances with the congregation. The facts show that petitioners fully controlled the church accounts, used money in those accounts at will, including to pay personal expenses, and were not accountable to anyone in their congregation for their use of the church funds. Accordingly, we conclude that petitioners

exercised dominion and control over the church bank accounts. Consequently, all deposits into those accounts, except those from nontaxable sources, are properly includable in petitioners' gross income. See Price v. Commissioner, T.C. Memo. 2004-103; Cohen v. Commissioner, T.C. Memo. 2003-42; Woodall v. Commissioner, T.C. Memo. 2002-318; Woods v. Commissioner, T.C. Memo. 1989-611.

B.    Reconstructing Petitioners' Income Using Bank Deposits

When using the bank deposit method, the IRS may assume that all money deposited into the taxpayer's account during a given period constitutes taxable income, but it is required to take into account any nontaxable source or deductible expense of which it has knowledge. DiLeo v. Commissioner, 96 T.C. at 868. In the instant case, respondent's bank deposit analysis appears to us to be overzealous, requiring that we review respondent's determinations of what items are obviously from nontaxable sources or constitute deductible expenses.

1.    Petitioners' 2005 Tax Year

Respondent refused to concede that petitioners' Federal tax refunds for 2004 should not be included in petitioners' income for 2005. In his reply brief, respondent contends the following:

> The deposited checks in 2005 include federal income tax refund checks. In light of the circumstances and facts of this case, respondent is unwilling to concede that those refunds were correctly and properly made to petitioners. Therefore, respondent does not concede that those refunds are non-taxable in 2005.

It appears that respondent is contending that petitioners are liable for deficiencies in income taxes from prior years and is attempting to recover some of those deficiencies by including petitioners' tax refunds from 2004 in their income for 2005. Respondent cites no authority that would permit such a determination, and we find none. Accordingly, we conclude that petitioners' Federal tax refunds should not be included in their income for 2005.

In addition to petitioners' Federal tax refunds from 2004 and in addition to those items already conceded by respondent totaling $205, we also conclude that the following deposits into petitioners' personal bank account, the M&T account, during 2005 obviously were nontaxable:

| Date | Payor | Payee | Memo Line | Nontaxable Category[1] | Amount |
|---|---|---|---|---|---|
| 2/18/05 | Elizabeth R. Chambers | Kathryn Chambers | art supplies | B | $6.35 |
| 5/16/05 | [Illegible] | Jeremy Chambers | prom gel | B | 8.50 |
| 5/16/05 | Erie Insurance Group | Kathryn Chambers & Thomas Chambers | | C[2] | 39.00 |
| 5/26/05 | Elizabeth R. Chambers | Justin Chambers | | A | 5.00 |
| 8/26/05 | Elizabeth R. Chambers | Kathryn Chambers | | A | 5.00 |
| 8/26/05 | Cheryl D. Chambers | Christy Chambers | | A | 25.00 |
| 9/6/05 | Elizabeth R. Chambers | Thomas F. Chambers | B-day | A | 5.00 |
| 9/14/05 | Elizabeth R. Chambers | Jeremiah Chambers | | A | 5.00 |
| 9/14/05 | L. Jane Johnson | Tom Chambers | Happy 50th | A[3] | 50.00 |
| 10/7/05 | Lisa B. Corby | Christy Chambers | mission trip | A | 80.00 |
| 10/31/05 | Joseph B. Kirkland III | Jeremy Chambers | India | A | 75.00 |
| Total | | | | | 303.85 |

[1]The letters correspond to the following nontaxable categories: (A) Gifts; (B) reimbursements; and (C) refunds.

[2]Although the purpose of the check from Erie Insurance Group is not obvious to us, respondent conceded that a similar check paid to petitioners during 2006 was nontaxable.

[3]Although we view purported gifts within the employment context, including gifts from church members to pastors, with some skepticism, see, e.g., Banks v. Commissioner, T.C. Memo. 1991-641, the small size and isolated nature of such a check from a single church member on the occasion of Mr. Chambers' birthday lead us to conclude that the transfer proceeded from a detached and disinterested generosity and is therefore a gift.

Petitioners contend that a number of other deposits should also be considered nontaxable (disputed deposits), many of which petitioners contend are gifts.  However, we conclude that the disputed deposits are properly included in petitioners' income.  Although petitioners contend that the disputed deposits are nontaxable, petitioners have offered no testimony or other evidence to show that the disputed deposits are indeed nontaxable.  It is not clear from looking at the list of disputed deposits that they are as petitioners claim them to be.  Because petitioners have the burden of proving that such deposits are nontaxable but have not done so, we conclude that the disputed deposits are taxable.

The parties agree that some of the payments into the M&T account from e3 Partners, also known as Global Partners or Global Missions, are nontaxable reimbursements.  In the stipulations of fact, the parties agreed that those reimbursements totaled $10,826 for 2005.  However, petitioners now contend that the reimbursements total more.  We are unable to determine how the parties arrived at the sum of $10,826 and believe it to be an error.  We may disregard a stipulation where it is clearly

contrary to the evidence in the record, and we do so here.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

Petitioners received two types of distributions from e3 Partners during the years in issue.  Mr. Chambers received what appears to be a regular salary from e3 Partners, which came in the form of regular checks of $1,000.  During 2005 those checks were labeled as paid from the e3 Partners' payroll account.  Mr. Chambers received other checks from e3 Partners which were payable in a variety of denominations.  Halfway through 2005, e3 Partners switched to direct deposit for the nonpayroll checks.  During 2006 the sum of those deposits equals exactly the amount that the parties have agreed constitutes nontaxable reimbursements.  We therefore assume that those deposits are the nontaxable reimbursements to which the stipulation refers.  The sum of those deposits during 2005 is $11,807.80, but that amount does not include checks that also appear to be reimbursements but that were received by Mr. Chambers before e3 Partners began depositing them directly into his account.  Including those checks increases the total for nontaxable reimbursements to $15,303.87.  Unless the parties agree to some other amount during their Rule 155 computations that we order below, we hold that $15,303.87 is the amount that should be excluded from petitioners' income as nontaxable reimbursements from e3 Partners during 2005.

We also conclude that respondent made several errors in his calculation of the sum of deposits into the M&T account during 2005. He made errors in petitioners' favor when he neglected to include $4,000 in "cash back" that petitioners received as part of two deposits. He also made an error in respondent's favor when he neglected to subtract a $1,000 deposit adjustment made by the bank after petitioners incorrectly recorded a $1,000 deposit as a $2,000 deposit. Accordingly, we have adjusted the sum of deposits listed below to reflect those corrections. We conclude that petitioners should include in their gross income for 2005 the deposits to the M&T account as follows:

| | |
|---|---:|
| Total deposits: | $51,890.76 |
| Less Federal tax refund | 9,051.36 |
| Less nontaxable items conceded by respondent | 205.00 |
| Less nontaxable items found by the Court | 303.85 |
| Less nontaxable reimbursements from e3 Partners | 15,303.87 |
| Amount to be included in gross income | 27,026.68 |

We now consider the amount from deposits into the Biblical Church bank accounts that should be included in petitioners' gross income for 2005.

Petitioners contend that certain amounts deposited into the Biblical Church bank accounts during the years in issue are not includable in petitioners' income because they represent proceeds from sales of gold coins that petitioners donated to Biblical Church. Mrs. Chambers testified that she inherited cash from her

parents, used that cash to purchase gold coins, and later donated those gold coins to Biblical Church. She testified that petitioners then sold those gold coins, on behalf of Biblical Church, over the course of several years to a man named James Schlosser. Petitioners testified that James Schlosser paid for those coins with checks written on the account of Surgical Resources Business Trust by the trustee, Leroy E. Glick. During the years in issue petitioners deposited those checks, totaling $30,281, into the Biblical Church bank accounts.

Petitioners offered no other evidence to substantiate their testimony about the sale of the gold coins. The checks from Surgical Resources Business Trust neither corroborate nor contradict petitioners' testimony. Many of the checks have no notation in the memo line, but a few contain enigmatic notes such as: "Resources - i.e. See attached / Private & Confidential"; "Lawful Agreement"; or "Lawful/Resources per Agreement."

Respondent contends that petitioners' testimony regarding the sale of the gold coins was contradictory. Respondent's contention is based on the premise that Mr. Chambers stated that Mrs. Chambers inherited the gold coins directly from her parents, which would contradict Mrs. Chambers' testimony that petitioners used cash they inherited from Mrs. Chambers' parents to purchase the coins. However, Mr. Chambers never clearly explained where the gold coins originated. In addition, he separately testified

that petitioners had received cash from the inheritance. Although petitioners' testimony regarding the gold coins was somewhat difficult to follow, we do not find it contradictory. Nonetheless, because petitioners have the burden of proving that the $30,281 should not be included in their income and because petitioners failed to provide any evidence to corroborate their testimony, we conclude that petitioners have failed to carry their burden of proof that the income from the Surgical Resources Business Trust checks should be excluded from petitioners' gross income.

In reviewing respondent's bank deposit analysis of the Biblical Church bank accounts, we found that respondent made two minor transcription errors when he calculated the sum of deposits into the National Penn account during 2005, which we have corrected in the totals we set forth below. We found that respondent's calculations of total deposits into the Lancaster account were accurate, with minor differences due to rounding. Accordingly, we conclude that petitioners' gross income for 2005 is as follows:

| | |
|---|---|
| Taxable deposits into M&T account | $27,026.68 |
| Taxable deposits into Lancaster account | 67,746.62 |
| Taxable deposits into National Penn account | 21,779.25 |
| Total | 116,552.55 |

The sum of taxable deposits into the three accounts includes the income from Superior Walls, which the parties have agreed was taxable. The sum of $116,552.55 must be reduced by the income

petitioners already reported on their return for 2005, insofar as any of that income was deposited into any of the three bank accounts.

2.  Petitioners' 2006 Tax Year

We now proceed to consider respondent's analysis of petitioners' bank deposits during 2006.  In addition to those items already conceded by respondent in his reply brief totaling $343.29, we conclude that the following deposits into the M&T account during 2006 were nontaxable:

| Date | Payor | Payee | Memo Line | Nontaxable Category[1] | Amount |
|---|---|---|---|---|---|
| 5/19/06 | Yvonne S. Miller | Jeremy Chambers | Congratulations | A | $50.00 |
| 5/19/06 | L. Jane Johnson | Jeremy Chambers | Congratulations | A | 50.00 |
| 5/19/06 | Elizabeth R. Chambers | Jeremy Chambers | | A | 35.00 |
| 5/19/06 | Timothy P. Chambers | Jeremy Chambers | graduation | A | 50.00 |
| 5/19/06 | Gail J. Reitzel | Jeremy Chambers | gift | A | 20.00 |
| 5/19/06 | Lancaster Bible College | Jeremiah Thomas Chambers | | C | 787.00 |
| 5/19/06 | Elizabeth R. Chambers | Christen Chambers | [drawing of a birthday cake] | A | 5.00 |
| 5/30/06 | Elizabeth R. Chambers | Kathryn Chambers | | A | 5.00 |
| 5/30/06 | Donna J. Gregory | Jeremy Chambers | Graduation Gift | A | 50.00 |
| 6/20/06 | Elizabeth R. Chambers | Christen Chambers | | A | 15.00 |
| 9/7/06 | Elizabeth R. Chambers | Kathryn Chambers | | A | 73.00 |
| 9/7/06 | Pennsylvania Turnpike Commission | Kathy Chambers | | C | 15.00 |
| 9/7/06 | Paul N. Chambers | Thomas F. Chambers | Birthday 06 | A | 25.00 |
| 9/7/06 | Elizabeth R. Chambers | Thomas F. Chambers | [drawing of a birthday cake] | A | 5.00 |
| 9/26/06 | Temitope O Jegede | Christy Chambers | Amazon bk refund | C | 25.07 |
| Total | | | | | 1,210.07 |

[1]The letters correspond to the following nontaxable categories:  (A) Gifts; (B) reimbursements; and (C) refunds.

Petitioners contend that a number of other deposits also are nontaxable, many of which petitioners contend are gifts. As we explained above, those deposits are properly included in petitioners' income because petitioners have the burden of proving that they are nontaxable but did not do so.

The parties agree that $47,221 in deposits from e3 Partners during 2006 should not be included in petitioners' income because those deposits represent nontaxable reimbursements.

We conclude that respondent made an error in calculating the total deposits into the M&T account during 2006 because he double-counted one deposit. Accordingly, we have adjusted the sum of deposits to reflect that correction. We conclude that petitioners should include in their gross income for 2006 the deposits from the M&T account as follows:

| | |
|---|---:|
| Total deposits | $79,561.18 |
| Less nontaxable items conceded by respondent | 343.29 |
| Less nontaxable items found by the Court | 1,210.07 |
| Less nontaxable reimbursements from e3 Partners | 47,221.00 |
| Amount to be included in gross income | 30,786.82 |

For the reasons explained above, we conclude that petitioners also must include the deposits into the Biblical Church bank accounts in their income for 2006. Upon review of respondent's bank deposit analysis of the Biblical Church bank accounts for 2006, we conclude that respondent neglected to include one $50 deposit from the National Penn account that we

have included in the total we set forth below.  We conclude that respondent's reconstruction of deposits into the Lancaster account was accurate.  Accordingly, we conclude that petitioners' gross income for 2005 is as follows:

| | |
|---|---|
| Taxable deposits into M&T account | $30,786.82 |
| Taxable deposits into Lancaster account | 26,805.75 |
| Taxable deposits into National Penn account | 8,439.00 |
| Total | 66,031.57 |

The sum of taxable deposits into the three accounts includes the income from Superior Walls that the parties have agreed was taxable.  The sum of $66,031.57 also must be reduced by the income petitioners already reported on their return for 2006, including the income from Superior Walls reported on their Schedule C, insofar as any of that income was deposited into any of the three bank accounts.

In summary, we conclude that petitioners must include the following amounts from the bank deposit analysis in their income for the years in issue:

| Year | Amount Includable in Income |
|---|---|
| 2005 | $116,552.55 |
| 2006 | 66,031.57 |

III. Whether Any Portion of the Underpayment Was Due to Fraud

Section 6663(a) imposes a penalty "equal to 75 percent of the portion of the underpayment which is attributable to fraud." Taxpayers commit fraud when they "evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the

collection of taxes." Parks v. Commissioner, 94 T.C. 654, 661 (1990); see also Neely v. Commissioner, 116 T.C. 79, 86 (2001). The Commissioner bears the burden of proving fraud and must establish it by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To satisfy his burden of proof, the Commissioner must show that (1) an underpayment in tax exists, and (2) the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes. Neely v. Commissioner, supra at 86. If the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud. See sec. 6663(b).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992). Fraud will never be presumed. Id.; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence and inferences drawn from the facts because direct proof of a taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492, 499 (1943); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). Circumstantial evidence that may give rise to a finding of fraudulent intent includes: Understatement of income, inadequate records, failure to file tax returns, concealment of assets, failure to cooperate with tax authorities, filing false documents, failure to make estimated tax payments,

engaging in illegal activity, attempting to conceal illegal activity, dealing in cash, implausible or inconsistent explanations of behavior, an intent to mislead which may be inferred from a pattern of conduct, and lack of credibility of the taxpayer's testimony.  Spies v. United States, supra at 499.

Respondent contends that there is sufficient circumstantial evidence in the record to conclude that petitioners fraudulently intended to evade taxes for 2005 and 2006.

Respondent argues that petitioners' lack of records is circumstantial evidence of fraud.  Petitioners failed to produce any Biblical Church records to substantiate their testimony that they used cash withdrawn from the church bank accounts to fund their mission trips.  Petitioners contend that pursuant to section 7611 they were not required to produce church records. As we explained above, petitioners' contention is mistaken. However, petitioners' mistaken contention indicates little about whether petitioners had fraudulent intent.  Moreover, the record does not establish that petitioners failed to keep records; it merely shows that they failed to give those records to respondent.  Indeed, petitioners testified that they did keep records and attempted to introduce such records for the first time at trial.  We sustained respondent's objection to the admission of such records on the basis that petitioners had failed to produce such records in response to our pretrial order.

While petitioners' course of action could be taken as a lack of cooperation with respondent, it appears that some of that lack of cooperation was based upon petitioners' mistaken understanding of section 7611.

Respondent contends that the organization of Biblical Church as a corporation sole under Utah law shows that petitioners fraudulently intended to avoid paying taxes. The Commissioner has defined a corporation sole as "a corporate form authorized under certain state laws to enable bona fide religious leaders to hold property and conduct business for the benefit of the religious entity." Rev. Rul. 2004-27, 2004-1 C.B. 625, 626. The corporation sole originated in the common law of England, where it was used to ensure that property dedicated to the church would remain so, rather than passing to the heirs of the bishop or other church leader. See Terrett v. Taylor, 13 U.S. 43, 46 (1815); Cnty. of San Luis Obispo v. Ashurst, 194 Cal. Rptr. 5, 6-7 (Ct. App. 1983). The corporation sole operates to ensure that property held in the name of the church's titular head passes, by operation of law, to his successors in office. See Cnty. of San Luis Obispo v. Ashurst, supra at 6-7.

Although, as Rev. Rul. 2004-27, 2004-1 C.B. at 626, discusses, corporations sole have been abused by taxpayers trying to avoid paying taxes, they are also a legitimate form of

religious organization recognized in a handful of States.[6]  Until

May 3, 2004, Utah was one of the States that allowed churches to

organize as corporations sole under its laws.[7]  Because we have

concluded that Biblical Church was a legitimate church, we reject

respondent's contention that petitioners' choice to organize it

as a corporation sole suggests that petitioners fraudulently

intended to evade taxes.

Respondent draws our attention to petitioners' failure to

have Biblical Church recognized as a tax-exempt entity under

section 501(c)(3).  However, the Code does not require churches

to apply for tax-exempt status; it grants that status

automatically.  See sec. 508(c).

---

[6]States that have corporation sole statutes include:
Alabama, Ala. Code sec. 10A-20-1.01 to .09 (LexisNexis 2009),
Alaska, Alaska Stat. sec. 10.40.010 to .150 (2010), Arizona,
Ariz. Rev. Stat. Ann. sec. 10-11901 to -11908 (2004), California,
Cal. Corp. Code secs. 10000 to 10015 (West 2006), Colorado, Colo.
Rev. Stat. secs. 7-52-101 to -106 (2010), Hawaii, Haw. Rev. Stat.
secs. 419-1 to -9 (2008), Montana, Mont. Code Ann. sec. 35-3-101
to -210 (2009), Nevada, Nev. Rev. Stat. Ann. sec. 84.010 to -.150
(LexisNexis 2010), Oregon, Or. Rev. Stat. sec. 65.067 (2009),
Washington, Wash. Rev. Code. Ann. sec. 24.12.010 to .060 (West
2005), and Wyoming, Wyo. Stat. sec. 17-8-101 to -117 (2009).  In
addition, Arkansas and Florida have recognized the common law
corporation sole.  See, e.g., City of Little Rock v. Linn, 432
S.W.2d 455 (Ark. 1968); Reid v. Barry, 112 So. 846 (Fla. 1927).

[7]Utah Code Ann. sec. 16-7-16 (LexisNexis 2009) provides:
"Notwithstanding any other provision of this chapter, a
corporation sole may not be formed or incorporated under this
chapter after May 3, 2004."

Respondent further contends that Biblical Church's organizing documents set it up as a "tax-hostile" entity, showing that petitioners had no intention of complying with the tax law. Respondent points specifically to an article from Biblical Church's organizing document that states:

> This Corporation Sole is a full-time Ministry and Spiritual Order which * * * is mandatorily excepted by an "unrestricted" right, as referenced in United States law Title 26, §§ 6033(a)(2)(A)(i) and (iii), § 1341(a)(1) and § 508(c)(1)(A), from any form of taxation and from filing any returns or reports/documents * * *.

However, the paragraph respondent cites is largely a recitation of the tax law applicable to all churches. Section 6033(a)(3) provides that all churches have a mandatory exception from filing the information returns that almost all other tax-exempt organizations are required to file annually. Section 508(c)(1)(A) provides that all churches have a mandatory exception from filing for recognition of their tax-exempt status under section 501(c)(3). Those statutes provide the mandatory exceptions from reporting and exemption from paying tax that Biblical Church claimed in its articles of corporation sole. Biblical Church's reference to those mandatory exceptions does not establish that petitioners harbored any intent to evade taxes believed to be owing.

Respondent contends that petitioners' attempt to assign the income they earned from janitorial work at Superior Walls to Biblical Church is evidence of their intent to conceal income.

Petitioners contend that they intended their work for Superior Walls as a fundraiser for Biblical Church. The circumstances surrounding petitioners' conduct with Superior Walls are certainly suspect. However, the fact that petitioners later learned that they needed to report the income from Superior Walls on their income tax return and that they did report that income during 2006 mitigates the suspiciousness of the situation, suggesting that petitioners had no intent to evade taxes. In any case, mere suspicion does not satisfy respondent's burden of proof for fraud, which requires clear and convincing evidence. See Katz v. Commissioner, 90 T.C. 1130, 1144 (1988).

Finally, and most forcefully, respondent contends that petitioners' fraudulent intent to evade taxes is evidenced by the fact that they opened the Lancaster account using a false taxpayer identification number. If the record supported respondent's version of events, it would indeed be a badge of fraudulent intent. However, petitioners have offered a different story that is consistent with the uncontested facts. Both parties agree that the coversheet setting up the Lancaster account is typed except for the handwritten EIN. Respondent's witness from the bank[8] established that the policies and

---

[8] We note that respondent's witness was not the person who actually opened the Lancaster account for petitioners, nor did respondent's witness work for the Bank of Lancaster County at the time petitioners opened the account. Rather, respondent's

(continued...)

procedures in place at that time permitted Bank of Lancaster County employees to open accounts for customers without an EIN, as long as those customers agreed to later supply the number. The employees were instructed to leave blank the EIN field, which would later be filled in by hand.

Mr. Chambers testified that several months after petitioners originally had opened the Lancaster account, he went back to the Bank of Lancaster County to give the bank the EIN he had received from the IRS. However, when he told the bank representative that he wanted to provide the EIN for Biblical Church, she looked up the account and told him that the bank already had an EIN in its system. Mr. Chambers did not give the Bank of Lancaster County the EIN he had received from the IRS or verify that the EIN matched the number in the bank's system.

The facts surrounding the EIN associated with the Lancaster account are certainly suspect, but respondent has the burden of proof to clearly and convincingly prove fraudulent intent, and he has not convinced us that his version of events is the one we should believe. As stated above, we will not sustain a finding of fraud on the basis of circumstances which at the most create only suspicion. Katz v. Commissioner, supra at 1144. Moreover,

---

[8](...continued)
witness was a bank employee familiar with the procedures for opening a new account that were in place at the Bank of Lancaster County during the period when petitioners opened the Lancaster account.

respondent's version of events also is somewhat at odds with other uncontested facts. For instance, petitioners established several other bank accounts for Biblical Church, and all of those accounts have the correct EIN. Additionally, during 2006, petitioners discovered that the Lancaster account had the wrong EIN, at which time they closed it and opened a new account using a correct EIN.

Considering all of the facts and circumstances, we conclude that respondent has failed to prove petitioners' fraudulent intent by clear and convincing evidence. Accordingly, we hold that petitioners are not liable for the fraud penalty pursuant to section 6663 for either year.

In reaching these holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.